Albert R. Richards and Mildred A. Richards, et al. [1] v. Commissioner. Richards v. Commissioner
Docket Nos. 1500-69, 1501-69, 1502-69, 1503-69, 1513-69.
United States Tax Court
T.C. Memo 1972-126; 1972 Tax Ct. Memo LEXIS 132; 31 T.C.M. (CCH) 504; T.C.M. (RIA) 72126; June 5, 1972
Dudley M. Lang and Lonnie G. McGee, for the petitioners. Norman H. McNeil, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax against the petitioners for the taxable year 1965 as follows: Dkt.
Deficiency
Petitioner
No.
Determined
Albert A. Richards and Mil- dred A. Richards
1500-69
$ 7,401.00
Wayne T. Carroll, Jr. and Janet C. Carroll
1501-69
814.00
William E. Greer, Jr. and Marian Greer
1502-69
10,608.00
Clifford W. Richards and Dorothy E. Richards
1503-69
7,401.00
Omer K. Tingle and Helen P. Tingle
1513-69
12,194.00
The only issue is whether the petitioners are entitled to report the gain upon the sale by them of an undivided one-half interest *133 in real estate upon the installment method under section 453(b) of the Internal Revenue Code of 1954, which depends upon whether the payments received in the year of sale did not exceed 30% of the selling price. Findings of Fact Some of the facts were stipulated and are incorporated herein by this reference. At the time of filing their petitions herein the petitioners Albert R. Richards and Mildred A. Richards resided at Newport Beach, California; petitioners Wayne T. Carroll, Jr. and Janet C. Carroll resided at Balboa, California; and the petitioners William E. Greer, Jr. and Marian Greer, Clifford W. Richards and Dorothy E. Richards, and Omer K. Tingle and Helen P. Tingle resided at Rolling Hills, California. All the petitioners filed their income tax returns with the district director of internal revenue, Los Angeles, California. Hereinafter the male petitioners will be referred to as the petitioners, since their wives are parties hereto only because of having filed joint income tax returns with their husbands. On or about September 28, 1961, the petitioners purchased 8.6 acres of unimproved land located on Palos Verdes Peninsula, California, from Great *134 Lakes Properties, Inc., a Delaware corporation (hereinafter referred to as Great Lakes), each obtaining an undivided interest therein. The purchase was made in anticipation that the site would ultimately be suitable for development into an apartment complex. The agreed purchase price was $263,010, of which $10,000 was paid as the down payment, and the balance of $253,010 was evidenced by a purchase money promissory note secured by a first deed of trust in favor of Great Lakes. The principal amount of the promissory note was payable in four installments, the first installment being due and payable on or before September 20, 1962, and the last installment being due and payable on or before September 20, 1965. Under the deed of trust petitioners were entitled to partial reconveyance upon part payment. The petitioners' aggregate cost basis for the property (including properly capitalized costs of $2,878) was $265,888, allocable as follows: Undivided
Petitioner
Interest (%)
Basis
Albert Richards
16%
$ 42,542
Wayne Carroll
4%
10,636
William Greer
32%
85,084
Clifford Richards
16%
42,542
Omer Tingle 32%
85,084
Total
100%
$265,888
On May 4, 1965, the *135 balance of the principal of the loan On May 4, 1965, the balance of the principal of the loan due Great Lakes was $131,505. In January or February 1965, petitioner Tingle acting on behalf of all the petitioners contacted United California Bank (hereinafter sometimes referred to as the bank) and began negotiations for a loan of $200,000 to refinance the property. The bank requested all information about the property, the petitioners' financial condition, and their intentions with regard to the property. Tingle told the bank of their intention to improve the property by building a garden apartment complex. The bank indicated it wanted a first refusal on the loan for construction. The petitioners were considering building an apartment building containing in excess of 200 units, but felt that this was too large a project for the existing group, and therefore decided to attempt to sell an interest in the property to others. In April 1965, petitioners Tingle and Greer, on behalf of the petitioners, started discussions toward this end with three individuals, Charles Delio, Robert White, and Rea Rawlins (hereinafter referred to as the buyers). The buyers were told that the petitioners *136 had a loan commitment and were processing a loan for $200,000. The petitioners' original idea was to obtain the loan and pay off the existing mortgage before making a sale. Accordingly, there was no discussion with 506 the buyers as to their assuming the existing obligation on the property. However, at some stage in the discussion with the buyers an agreement was reached that the buyers would become parties to the new loan. The petitioners disclosed to the bank the identity of the buyers at an early stage of the discussion with the buyers. Prior to May 4, 1965, petitioner Tingle, acting on behalf of the petitioners, submitted an application to the bank for a loan in the amount of $200,000. A portion of the loan proceeds was proposed to discharge the promissory note to Great Lakes which was secured by the property. The bank's loan approval and credit report, dated May 4, 1965, respecting the loan application stated that the excess of the loan over the amount necessary to retire the existing lien on the property was to be distributed to petitioners. It was also stated therein that Dr. Delio was buying a one-third interest in the project for a consideration of approximately $280,000, *137 and that there had been submitted financial statements of Tingle, Greer, and Delio. On or about June 11, 1965, the application for the loan was approved, but in the amount of $180,000. In connection with the loan, the bank wanted all the petitioners to open accounts with the bank. The petitioners Tingle and Greer did open accounts. However, Delio, one of the buyers, did not open an account. On or about June 18, 1965, the petitioners orally agreed to sell, for a consideration of $387,000, an undivided one-half interest in the property to the buyers. On or about June 18, 1965, an escrow was opened with the escrow department of the bank creating a combination escrow dealing not only with the sales transaction, but also with the disbursement of the loan proceeds. The combination escrow was used as a matter of convenience and as a means of saving escrow charges and title insurance costs. The escrow instructions dated June 18, 1965, were signed by the petitioners and the buyers. Such instructions recited that the sales price was $387,000, to be paid to the petitioners in the form of "Cash Through Escrow" in the amount of $190,000 and "New Encumbrances" in the amount of $197,000; that *138 the bank was to procure title insurance in the amount of $387,000 on an undivided one-half interest in the property showing title vested in the buyers free of encumbrances except taxes, restrictions of record, if any, and a second trust deed executed by the buyers securing a promissory note in the amount of $197,000 in favor of petitioners, which was to recite that it was subject to a first deed of trust to be recorded concurrently; and that all costs in the escrow, with the exception of cost of paying off the encumbrances of record, would be paid one-half by the buyers and one-half by the petitioners, and that the buyers would deposit $1,800 representing their share of the bank loan fee. In the buyers' portion of the instructions it was stated that the buyers would hand to the bank as escrow agent "$190,000 of which amount $90,000 will be our share of proceeds of $180,000 U.C.B. loan on subject property." In the sellers' portion of the instructions the bank was instructed to hold $190,000 for the account of the petitioners, to pay therefrom any charges due from petitioners, to pay at the close of the escrow any encumbrances (specifically the amount due Great Lakes) necessary to *139 place title in the condition called for under the instructions, and to pay any excess to the petitioners. On July 21, 1965, the escrow instructions were modified to provide that in lieu of cash through escrow to the petitioners of $190,000 the petitioners would accept a personal unsecured note from Delio in the amount of $20,000, and that therefore the amount of cash through escrow would be the sum of $170,000. On June 22, 1965, the petitioners and the buyers executed a promissory note in which they jointly and severally promised to pay the bank the sum of $180,000 on or before 2 years after date. Such note was secured by a first deed of trust on the property executed by the petitioners and the buyers. The petitioners delivered to the bank, as escrow holder, a grant deed conveying to the buyers an undivided one-half interest in the property. The buyers delivered to the bank, as escrow holder, cash in the aggregate amount of $82,555, representing the cash down payment of $80,000 and a deposit of $2,555 to cover their share of escrow expenses. In addition they executed in favor of the petitioners a promissory note in the principal amount of $197,000, payable in installments *140 commencing July 1, 1966, and a second deed of trust, both of which they delivered to the bank as escrow agent. Delio executed and delivered to the escrow agent an unsecured promissory note dated 507 July 21, 1965 in favor of the petitioners in the amount of $20,000, payable on or before 6 months after date. The escrow agent disbursed $143,412.73 to Great Lakes and the latter executed a reconveyance of its first deed of trust, cancelled the note, and delivered them to the bank. On or about August 6, 1965 the bank closed the transaction and filed the abovementioned deeds for record. On August 6, 1965 the bank prepared an "Escrow Settlement Sheet" showing that it deposited an amount of $113,929.24 and disbursed to petitioners checks totaling $113,929.24, representing the $80,000 cash paid by the buyers plus the excess of the total loan of $180,000 over the amount of principal and interest paid to Great Lakes ($143,412.73), less however an amount of $2,658.03 disbursed by the bank as the petitioners' share of the loan fee, taxes, and expenses of the sale. The trust deed loan of $180,000 was repaid in October 1967. At that time the petitioner Clifford Richards gave a check *141 from his personal funds to the bank for $87,840, his brother, the petitioner Albert Richards, gave a check from his personal funds to the bank for $87,840, and the petitioner Carroll gave the bank a check for $4,300. Petitioners, Clifford Richards and Albert Richards, then received notes secured by deeds of trust from the petitioners, Tingle and Greer, and from the buyers for their shares which were paid by the Richardses. In their income tax returns for the taxable year 1965, each of the petitioners reported his share of the gain upon the sale upon the installment method. They reported the selling price of the half interest as $387,000, of which 30% equals $116,100. They viewed the transaction as an assumption by the buyers of one-half of the $180,000 loan, or $90,000, and considered that the payments in the year of sale amounted to $104,248, consisting of $80,000 paid by the buyers plus the excess of the $90,000 loan "assumed" by the buyers over one-half of the Great Lakes loan ($90,000 minus $65,752.50, or $24,247.50). In the notices of deficiency, the respondent determined that the petitioners received an initial payment in the year of sale in excess of 30% of the selling price *142 of the property and that therefore they were not entitled to report the gain upon the sale upon the installment method. Opinion The issue is whether the petitioners are entitled to report the gain upon the sale of a one-half interest in their property on the installment method under section 453 of the Internal Revenue Code of 1954. There are set forth in the margin pertinent provisions of section 453 and the Income Tax Regulations. [2]
*143 The selling price of the one-half interest was $387,000 and 30% thereof is $116,100. The respondent contends that the buyers made payments in the year of sale totaling $170,000, consisting of $80,000 from their own funds and $90,000 representing their 508 share of the proceeds of the $180,000 loan obtained from the bank, and that since such amount is in excess of 30% of the selling price the petitioners are not entitled to the benefit of section 453. The petitioners, on the other hand, contend that the only payment in the year of sale consisted of the $80,000 payment made by the buyers out of their own funds, and that, therefore, since this is less than 30% of the selling price, they are entitled to report their profit on the installment method. It is their position that in substance the petitioners obtained the $180,000 loan on the property; paid off the existing indebtedness to Great Lakes; that the buyers then assumed one-half of the loan, or $90,000; and that since this is less than the petitioners' basis for the interest sold ($132,944), no part of the loan proceeds should be included as a payment in the year of sale. They rely upon R.A. Waldrep, 52 T.C. 640, *144 affd. (C.A. 5) 428 F. 2d 1216, for their contention that in effect there was an assumption of the obligation. In the alternative, they contend that even if the buyers initially borrowed one-half of the proceeds of the $180,000 loan from the bank, the portion of such proceeds used to satisfy the note to Great Lakes did not constitute a year of sale payment, and that petitioners' installment reporting election was valid. It is their contention that under such a view of the case it should be considered that the buyers assumed the obligation to retire one-half of the existing indebtedness to Great Lakes. We cannot accept the first contention advanced by the petitioners. Clearly, as the transaction was carried out, the petitioners did not alone borrow $180,000 from the bank and pay off the existing indebtedness on the property. Rather, both the petitioners and the buyers borrowed this amount and made themselves jointly and severally liable therefor. However, we are essentially in agreement with the petitioners' alternative view. Since the petitioners were retaining a one-half interest in the property and the buyers were acquiring a one-half interest, we think it clear that *145 each group undertook one-half of the $180,000 obligation to the bank. Obviously, however, the proceeds of the $180,000 loan, to the extent necessary, were committed to retirement of the indebtedness due Great Lakes. The bank certainly would not have loaned the $180,000 without committing such amount to such purpose, since payment of the Great Lakes indebtedness was necessary so that it could obtain a first trust upon the property to secure its $180,000 loan. We accordingly attribute little significance to the literal escrow instructions to the effect that the sales price was to be paid to the petitioners in part by $90,000 of cash representing the buyers' share of the $180,000 loan proceeds. Rather, it seems clear that the new loan of $180,000, for which the buyers and petitioners were equally liable, to the extent necessary to satisfy the existing loan of $131,505, constituted merely a substitution for such existing encumbrance upon the property. Under these circumstances we think that for tax purposes the transaction was tantamount to the assumption by the buyers of one-half of such existing indebtedness. Cf. R. A. Waldrep, supra.[3] Since the amount of such indebtedness assumed *146 by the buyers, $65,752.50, did not exceed the basis of the petitioners in the one-half interest of the property sold, such assumption is not to be considered to any extent a payment to the petitioners in the year of sale. However, the amount by which the buyers' share of the new loan exceeded the indebtedness assumed, namely, $24,247.50, was received by the petitioners when the escrow was closed, and constituted a payment to them in the year of sale. Accordingly, the total of payments received by petitioners in the year of sale was $104,247.50, consisting of such $24,247.50 and the cash of $80,000 paid by the buyers from their own funds. Such amount is less than 30% of the selling price, and therefore the petitioners are entitled to report the profit upon the sale on the installment method. *147 Decisions will be entered under Rule 50. 509 Footnotes
1. Cases of the following petitioners have been consolidated herewith: WAYNE T. CARROLL, JR. and JANET C. CARROLL, Docket No. 1501-69; WILLIAM E. GREER, JR., and MARIAN GREER, Docket No. 1502-69; CLIFFORD W. RICHARDS and DOROTHY E. RICHARDS, Docket No. 1503-69; and OMER K. TINGLE and HELEN P. TINGLE, Docket No. 1513-69. ↩
2. Section 453 of the Code provides as follows: INSTALLMENT METHOD. (a) Dealers in Personal Property. - (1) In general. - Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price. * * * (b) Sales of Realty and Casual Sales of Personalty. - (1) General rule. - Income from - (A) A sale or other disposition of real property * * * may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation. - Paragraph (1) shall apply - (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition - (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. Section 1.453-4 of the Income Tax Regulations provides in part as follows: (c) Determination of "selling price". In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453↩, and §§ 1.453-1 through 1.453-7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. The term "payments" does not include amounts received by the vendor in the year of sale from the disposition to a third person of notes given by the vendee as part of the purchase price which are due and payable in subsequent years. Commissions and other selling expenses paid or incurred by the vendor shall not reduce the amount of the payments, the total contract price, or the selling price.
3. In the Waldrep case the buyer did not, in form, assume an existing mortgage on the property sold; rather, it executed its note to the mortgagee in the amount of the sellers' existing indebtedness. We there stated: The transferee of land assumes the mortgage of his transferor when he agrees, expressly or impliedly, to become personally liable for the amount of the underlying debt. * * * We hold that this was tantamount to an assumption of petitioners' mortgages within the meaning of section 1.453-4(c), Income Tax Regs. In this context, we find no substantive distinction between a formal agreement to assume an existing mortgage and the creation of a new mortgage on the same property to secure a newly created personal liability of the transferee to the mortgage in the same amount. It should be noted that the instant case differs from the Waldrep case in that in the latter case the obligee remained the same. However, under the view we have taken above we do not consider this significant.↩